# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

In the Matter of the Search of

**8875 Troy Street**
**Spring Valley, California 91977**

APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT

08 MJ 1998

CASE NUMBER: _____

I  Special Agent Allan Karas  being duly sworn depose and say:

I am a  Special Agent of the Drug Enforcement Administration  and have reason to believe

that on the property or premises known as

**8875 Troy Street, Spring Valley, California, 91977; and the vehicle described as a 2005 Ford pick-up bearing California license 7W54668; , further described in Attachment A, herein incorporated by reference.**

in the Southern District of California, there is now concealed a certain person or property, namely

**See Attachment B, herein incorporated by reference**

which is the fruits, instrumentalities and evidence

concerning a violation of Title ___21___ United States Code, Section(s) 841(a)(1) and 846 ; and Title 18 United States Code, Section _2_ .

The facts to support a finding of Probable Cause are as follows:

See attached affidavit - continued on the attached sheets and made a part hereof.

J. ALLAN KARAS
DEA Special Agent

Sworn to before me, and subscribed in my presence

6/30/08 at 11:06 AM                    at    San Diego, California
Date/Time issued

~~Louisa S. Porter~~
United States Magistrate Judge

**BARBARA L. MAJOR**
**U.S. MAGISTRATE JUDGE**

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, J. Allan Karas, Special Agent United States Drug Enforcement Administration, being duly sworn, state:

## EXPERIENCE AND TRAINING

1. I am a Special Agent employed by the United States Drug Enforcement Administration (DEA) and have been so employed for more than ten years. I am currently assigned to the DEA San Diego Integrated Narcotic Task Force (NTF) and have been for more than ten years. I have received formal training in drug investigations. I am a graduate of the approximate 16-week DEA Basic Agent Academy specializing in drug identification and drug-crime investigations. I have received more than 200 hours of continuing narcotic officer training. I have made more than 100 arrests in San Diego County for controlled substances violations of both state and federal law. I have testified as a "possession for sale" expert witness in San Diego County court as part of my duties. I have spoken to users and sellers and to other experienced officers about controlled substances to complement my own experiences. I am familiar with the manner and techniques in which controlled substances are packaged, marketed, and consumed locally and domestically. I have received training in the identification of all types of controlled substances by sight and odor. I have become familiar with the ordinary meaning of controlled substance slang and jargon. Currently, I am assigned to the NTF Commercial Interdiction Team. In the course of my duties, I have made arrests for, and have investigated, transportation-related controlled substances violations and United States currency smuggling violations. Furthermore, through my training and experience, and through speaking with other experienced agents, I have learned the following:

    a. Individuals involved in drug trafficking often maintain at their residence quantities of controlled substances to include, but not limited to, marijuana and methamphetamine, as well as

paraphernalia for packaging, weighing, cutting, testing, distributing, manufacturing and identifying controlled substances.

  b. Individuals involved in drug trafficking often maintain at their residence records and ledgers evidencing their trafficking activities in order to keep track of the ordering, purchasing, storage, distribution and transportation of drugs. Even after the drugs are sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of the accounts receivable and accounts payable, and the names, identities and telephone numbers of suppliers, customers and coconspirators.

  c. Individuals involved in drug trafficking must often rely on others to obtain the drugs and to help them market the drugs and evidence of the identities of these coconspirators is often maintained at their residence.

  d. Individuals involved in drug trafficking earn sums of money and often try to legitimize these profits. In order to do this they attempt to secrete, transfer and conceal the money by, among other ways: placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these transactions are often found at their residence.

  e. Individuals involved in drug trafficking often maintain large amounts of U.S. currency in order to maintain and finance their ongoing drug business. In addition, other assets generated by their drug business, or purchased with the cash earned are often stored at trafficker's residences.

  f. Individuals involved in drug trafficking often maintain weapons, firearms and ammunition on their person or at their residence and cars in order to protect themselves and guard

their drugs and drug profits, and for enforcement purposes during their drug dealings. These weapons and firearms are used and can be used as an instrumentality of the crime of possession and distribution of drugs.

g. Premises used by individuals involved in drug trafficking usually contain articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises.

h. Individuals involved in drug trafficking frequently communicate with coconspirators by means of cellular telephones and electronic paging devices and usually maintain these items on their person or in their residences or vehicles.

i. Individuals involved in drug trafficking often utilize radio scanners, police radios and other electronic equipment in order to conduct counter surveillance upon law enforcement authorities.

j. Individuals involved in drug trafficking often maintain photographs, and/or audio and video recordings of their associates or real and personal property which were acquired with drug proceeds or property utilized to facilitate drug trafficking activities.

k. Individuals involved in drug trafficking often keep portions of the controlled substances they distribute in their vehicles. Drug traffickers do so for several reasons, including concern about becoming compromised and losing their supply to law enforcement authorities during a search. Additionally, through my training and experience, I have learned that drug traffickers also conceal controlled substance supplies in the vehicles out of fear of being "ripped off" (becoming a theft victim) by rival dope dealers.

l.      Individuals involved in drug trafficking often possess stolen property which is commonly used in trade for narcotics.

m.      Individuals involved in drug trafficking often register vehicles they own in the names of others in order to avoid loss of the vehicles through asset forfeiture laws in the event they are investigated or arrested.

2.      As a result of your affiant's personal participation in this investigation and information received from DEA agents, NTF agents and other law enforcement personnel, your affiant is familiar with all aspects of the investigation described in this affidavit.

### Locations to Be Searched

3.      Your affiant submits that the facts contained in the numbered paragraphs below are accurate, and that they demonstrate that there is probable cause to believe that controlled substances, including, but not limited to marijuana and methamphetamine, documents and records and other instrumentalities and evidence of violations of Title 21, United States Code, Sections 841(a)(1), 846, will be found at/in the single family residence located at 8875 Troy Street, Spring Valley, California (hereinafter **Target Location**). Your affiant believes he has probable cause to search the **Target Location** (including vehicles - specifically a 2005 Ford pickup truck, vehicle identification number 1FTPX12535NB77869, bearing California license 7W54668) and the surrounding area. The **Target Location**, including the vehicle noted-above is described more fully in Attachment A.

4.      Since this affidavit is being submitted for the limited purpose of securing authorization for the execution of a search warrant on the above-noted **Target Location** and vehicle, your affiant has not included each and every fact known to your affiant concerning this investigation.

Your affiant has set forth only the facts that your affiant believes are necessary to establish the required foundation for a search warrant for the **Target Location** and vehicle.

## PROPERTY OR ITEMS TO BE SEIZED

5.  Controlled substances, to include, but not limited to, marijuana and methamphetamine, documents and all other instrumentality's and evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, as well as violations of Title 18, United States Code, Section 2. See Attachment B for further details.

## PROBABLE CAUSE

6.  Several weeks ago, a reliable confidential informant advised your affiant that Jamie DISTEFANO resides at the **Target Location** and that DISTEFANO is distributing methamphetamine and marijuana from the **Target Location**.[1] More specifically, the CI reported the following: (a) on multiple occasions, the CI has personally witnessed DISTEFANO conducting the sale of controlled substances at the **Target Location**; (b) the CI has personally observed scales at the **Target Location** which the CI believes DISTEFANO uses to weight controlled substances; (c) the CI has observed weapons inside the **Target Location**; (d) DISTEFANO maintains security cameras on the exterior of the **Target Location** so that he can monitor activity around the perimeter, including possible law enforcement activity; (e) DISTEFANO maintains monitors inside the **Target**

---

[1] Your affiant is the CI's handling agent. While the CI does have a felony criminal history, the CI is a paid informant, not an individual working to mitigate his/her own personal situation. Your affiant has obtained information from the CI in past which proved to be reliable, credible information that could be (and was) independently corroborated. Furthermore, in past investigations, the CI's information assisted your affiant and other agents make arrests and seizures. Moreover, your affiant knows of no information the CI has provided in this, or past, investigations which has been false or materially misleading in any manner.

**Location** on which he is able to view feed from the above-noted security cameras; and (f) DISTEFANO typically conducts controlled substance transactions at the **Target Location** after 5:00 p.m. when the business adjacent to the **Target Location** has closed for the day.

7. In response to the above information, your affiant initiated an investigation into Jamie DISTEFANO and the **Target Location**. In doing so, your affiant subpoenaed San Diego Gas & Electric records for the **Target Location** and discovered that Jamie DISTEFANO is the current account holder for service at the residence. Through California state records, your affiant discovered that DISTEFANO has a criminal history, including two California felony convictions, one in 1988 and another in 1989, for violations of California Health & Safety Code section 11359 - Possession of Marijuana for Sale. Checks further revealed that the sentences for these convictions were imposed to run concurrent with each other. DISTEFANO also has a 1996 misdemeanor conviction for violating Californian Health & Safety Code 113777 - Possession of Methamphetamine, and 1997 conviction for violating California Penal Codes 211 and 496 - Armed Robbery and Receiving Stolen Property.

8. According to a San Diego County Sheriff's narcotic deputy with whom your affiant has spoken, on or about February 2006, the deputy received an anonymous tip (from an anonymous tip line), regarding a "Jamie" living at 8875 Troy Street (the **Target Location**). According to the tipster, Jamie was selling marijuana from the **Target Location**. After receiving this information, the deputy conducted surveillance at the **Target Location** and identified "Jamie" as Jamie DISTEFANO. According to the deputy, on one of the days he was conducting surveillance in an unmarked police vehicle, DISTEFANO noticed him and waved. Your affiant and other agents with whom you affiant has spoken to have had similar experiences when conducting surveillance on other

narcotic trafficking subjects. Your affiant and other agents have come to understand this activity as a show of arrogance, atypical of a citizen who noticed a vehicle watching his/her residence who would probably call the police and report someone watching his/her residence..

9. Over the past several weeks, your affiant has personally conducted surveillance on the **Target Location**. In doing so, your affiant observed DISTEFANO entering and exiting the **Target Location**. Your affiant observed DISTEFANO driving two different vehicles to and from the **Target Location**, including a 2005 pickup truck bearing California license 7W54668 which is registered to DISTEFANO at the **Target Location**.

10. During surveillance at the **Target Location** your affiant confirmed information the CI provided about video surveillance equipment on the exterior of the residence. Specifically, your affiant observed a camera mounted on the outside of the residence and a pit bull in front yard. In addition to the CI's information, your affiant is aware that drug traffickers often employ surveillance systems and guard dogs, particularly pit bulls, in order to protect their premises. This is to protect them from being robbed by other drug traffickers as well as to alert them to police surveillance and raids.

11. During surveillance, your affiant has noticed a high volume of foot traffic coming in and out of the **Target Location**. The traffic is more voluminous than your affiant would expect to see entering and exiting a typical single family residence. Your affiant does not believe there is a legitimate business at the **Target Location** that would warrant the high foot traffic being observed. Rather, it's your affiant's opinion that the observed foot traffic is consistent with the street level distribution of narcotics.

12. Furthermore, during surveillances on the **Target Location**, your affiant has also noticed, consistent with the CI's reports, that individuals visiting the residence do not typically arrive until after 5:00 p.m. Your affiant finds this to be significant when taken together with the knowledge that the **Target Location** is owned by the business sitting on the neighboring property which appears to close for business at approximately 4:30 p.m. or 5:00 p.m. each day. The adjacent business and **Target Location** share a common driveway. It's your affiant's belief that DISTEFANO is aware of the business' hours of operation and controls the flow of drug purchasers during it's business hours so as not to raise suspicions about his distribution activities at the **Target Location** to his landlord.

13. A summary of some of the more relevant surveillance observations your affiant and other agents have made at the **Target Location** are set out below:

   a. In the late afternoon on or about May 13, 2008, your affiant conducted surveillance while the business next to the **Target Location** was still open. During that time, your affiant observed a female exit the **Target Location** and walk to a nearby park, entered a vehicle, and drive from the area. Your affiant believes the female visited the **Target Location** to purchase narcotics. Your affiant believes that the female parked away from the **Target Location** and walked to the residence to avoid alerting the business next door to her arrival. As these events were unfolding, your affiant noticed that there was parking at the residence available that the female opted not to use. After making these observations, your affiant later ran a computer check on the vehicle the female was seen in. Your affiant identified the registered owner and then obtained a California Department of motor Vehicles (DMV) photograph of one of the co-owners- which matched the female seen leaving the **Target Location**. Your affiant learned that the female is currently on

probation for petty theft and for being under the influence of a controlled substance. She also has prior arrests for possession of drug paraphernalia and for possession of methamphetamine.

      b.      On the evening of June 3, 2008, your affiant conducted surveillance at the **Target Location**. Visitors begin to arrive at the residence after 6:00 p.m. One female visitor arrived by vehicle, entered the residence and then left approximately 30 minutes later. This female was later identified using DMV and law enforcement databases. She was discovered to have a criminal history, including arrests for possession of methamphetamine and possession of drug paraphernalia. Shortly thereafter, a second female arrived by vehicle, entered the residence and left approximately 15 minutes later. Your affiant followed the female from the **Target Location** to a residence that a local sheriff's deputy later identified as a well known "drug house."

      c.      Using law enforcement databases, your affiant identified the second female mentioned above as one and the same as the female who visited the residence May 13, 2008. On this occasion, your affiant noted that the female parked in the drive way of the **Target Location**, not at the park. Your affiant believes the female did so because the business next door was closed.

      d.      On the evening of June 3, 2008, your affiant also observed a male arrived at the **Target Location** by vehicle. The male stayed approximately one hour and then departed. Your affiant observed the male carry something in his arm. When the male drove away from the residence, a San Diego County Sheriff's marked patrol vehicle got behind him. Your affiant observed the male look at the marked vehicle as it was pulling behind him. Your affiant observed the male and watched him reach down and appear to hide something under his passenger seat. (Your affiant believes the driver was hiding drugs under his seat when he saw the San Diego County Sheriff's vehicle). The male then made an immediate left and pulled into a drive and exited the vehicle before the San Diego

9

Sheriff's deputy and your affiant could reach the location. Your affiant was not able to establish any link between the male and the address of the driveway he pulled into. Your affiant believes the male made this maneuver to avoid being pulled over. Your affiant subsequently obtained the registered owner information on the vehicle the male was driving and identified the male. Your affiant obtained the DMV photograph of the male and identified him as the driver who eluded the Sheriff's Deputy. Significantly, your affiant discovered that the male has a 1993 conviction for possession of methamphetamine for sale, and a 2000 conviction for possession of methamphetamine.

       e.      Approximately one hour and a half after the above-discussed male eluded the Sheriff's Deputy on June 3, 2008, the male was arrested by La Mesa Police for Transportation of Marijuana and for Possession of Methamphetamine for sale. The arrest was made after La Mesa Police found marijuana and methamphetamine in his car (which he appeared to reclaim after the San Diego Sheriff had left the area). Based on the above observations, specifically the male's conduct after he left the **Target Location**, your affiant believes that the male purchased the marijuana and the methamphetamine from DISTEFANO at the **Target Location**.

       f.      On or about June 12, 2008, your affiant re-established surveillance at the **Target Location**. During the surveillance, your affiant observed DISTEFANO exit the **Target Location** and depart in his 2005 Ford pickup truck, vehicle identification number 1FTPX12535NB77869, bearing California license 7W54668. Your affiant observed DISTEFANO drive to a parking lot, park, and then exit his truck. Upon exiting, DISTEFANO conducted what appeared to be two separate "hand-to-hand" drug transactions with two separate males. Your affiant bases this conclusion on the following observations: DISTEFANO and each of the two males made contact; each of the two males handed something to DISTEFANO; DISTEFANO in turn handed each

of the two males something back. During the course of the transactions, DISTEFANO and each of the two males attempted to be discreet. Surveillance agents followed one of the males who conducted a transaction with DISTEFANO as he departed the parking lot in a vehicle with a female. The male and female were surveilled to a residence. Upon arriving at the residence, the male and female exited their vehicle and entered the residence.

     g.     As your affiant and other agent approached the residence, your affiant observed a female drive up and park in front of the residence. The female exited the vehicle and began walking towards the residence. When the female spotted your affiant and the other agent, she turned, changed direction and began walking down the street away from the residence. Your affiant believes the female reacted in this fashion after suspecting that your affiant and other agent were law enforcement officers. As the female started walking away, your affiant called out to her and asked where she was going. In response, the female pointed to the residence your affiant and other agent were standing in front of (the residence where the male and female had entered earlier after the transaction with DISTEFANO).

     h.     At this point, another agent took over speaking with the female. While conversing with her, the agent notice the female had scaring and marks consistent with intravenous narcotic use. Furthermore, during the conversation, the agent obtained consent to search her vehicle and purse. During the consent search, needles (consistent with those used for injecting narcotics), were located in the female's purse contained within her vehicle. After identifying the female, your affiant and other agents determined that she has prior arrests, including an arrest for possession of methamphetamine.

11

i. While other agents dealt with the female discussed above, your affiant went to the door of the residence and knocked. When the door was answered, your affiant identified himself as law enforcement and was then invited inside. Your affiant encountered two persons in the front room and engaged them in conversation about the identity of the occupants of the residence. After speaking with these two individuals for a few moments, your affiant observed another three individuals exit the back area, including the male and female seen with DISTEFANO (neither reported being residents). The male agreed to answer questions. Upon doing so, the male lied about his whereabouts earlier in the evening. Rather than reporting anything about his meeting with DISTEFANO in a parking lot, the male indicated he only went out to the store. After identifying the male and female involved in the transaction with DISTEFANO, your affiant learned through a check of California law enforcement databases that both have arrest records, involving possession of methamphetamine and being under the influence of controlled substances. Your affiant believes that the male lied about meeting with DISTEFANO because the male purchased controlled substance(s) from DISTEFANO. Your affiant was given consent to search the residence. Your affiant and other agents began a cursory search of the residence. Your affiant did not locate any controlled substances during the search. Your affiant believes that while the male and female were in the back of the residence they easily heard your affiant discussing the residence with the occupants in the livingroom and used and/or destroyed the narcotics purchased from DISTEFANO. Later that same evening, your affiant learned that the above-noted residence is the subject of an ongoing San Diego Police Department methamphetamine investigation.

**Conclusion**

14. Based on CI information, your affiant's training and experience, and your affiant and other agent's personal observations, your affiant believes DISTEFANO resides and distributes controlled substances out of the **Target Location** and the 2005 Ford pickup truck, vehicle identification number 1FTPX12535NB77869, bearing California license plate 7W54668, and that probable cause exists that the **Target Location** and the above-noted pick up truck contain property that constitutes evidence of the commission of an offense under Title 21, United States Code, Sections 841 (a)(1) and 846 and Title 18, United States Code, Sections 2, and that there is probable that contraband and fruits of such offenses, and property designed and intended for use and which had been used as the means of committing such offenses - including the items listed in Attachments B will be found at the **Target Location** and/or on the premises of the **Target Location**, including the 2005 Ford pick up truck, bearing California plate number 7W54668.

14. Wherefore, your affiant respectfully requests that a search warrant be issued for **Target Location**, including the 2005 Ford pick up truck discussed above, authorizing a search of the premises' and the seizure of the items described with particularity in Attachment B to the Application and Affidavit for Search Warrant.

J. Allan Karas
Special Agent
Drug Enforcement Administration

SUBSCRIBED and SWORN to before me
on this 30th day of June 2008

LOUSIA S. PORTER
United States Magistrate Judge
**BARBARA L. MAJOR
U.S. MAGISTRATE JUDGE**

13

## ATTACHMENT A

8875 Troy Street, Spring Valley, California 91977 is a light-colored single family residence surrounded by a chain link fence with a driveway on one side and residences on the other side. The numbers 8-8-7-5 are affixed to the eave of the residence on the side facing the driveway.

2005 Ford pickup truck, vehicle identification number 1FTPX12535NB77869, bearing California license 7W54668.



ATTACHMENT B

a. Controlled substances to include, but not limited to marijuana and methamphetamine, paraphernalia for packaging, weighing, cutting, testing, distributing, growing, and identifying such controlled substance(s) including baggies, plastic wrapping, scales and other weighing devices.

b. Documents and computer or electronic devices (and their contents) containing data reflecting or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of such controlled substance(s), including buyer lists, seller lists, pay-owe sheets, records of sales, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, computer databases, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys.

c. Money and assets derived from or to be used in the purchase of such controlled substance(s) and records thereof, including U.S. currency, artwork, precious metals and stones, jewelry, negotiable instruments and financial instruments including stocks and bonds, and deeds to real property, books, receipts, records, bank statements and records, business records, money drafts, money order and cashiers check receipts, passbooks, bank checks, safes and records of safety deposit boxes and storage lockers.

d. Weapons, firearms, firearms accessories, and ammunition and documents relating to the purchase and/or possession of such items.

e. Equipment used to detect police activities and surveillance, including radio scanners, video cameras, monitors and tape and wire transmitter detectors.

f. Photographs and electronic images, such as video recordings and tape recordings (and their contents) which document the association with other co-conspirators and/or which depict narcotics, firearms, cash, real property, vehicles or jewelry.

g. Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility and telephone bills and receipts, photographs, answering machine tape recordings, telephone beeper or paging devices, rolodexes, telephone answering pads, storage records, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card and bank records, travel documents, personal identification documents, and documents relating to obtaining false identification, including birth certificates, drivers license, immigration cards and other forms of identification in which the same person would use other names and identities other than his or her own.

h. Telephone paging devices, beepers (and their contents), cellular/mobile phones (and their contents), and other communication devices which evidence participation in a conspiracy to possess, manufacture, or distribute controlled substances.

i. Telephone answering machines or devices, including listening to any recordings on the premises.

j. Items that can be identified as stolen property.

**ADDENDUM TO ATTACHMENT B - PROPERTY TO BE SEIZED**

## ADDENDUM TO ATTACHMENT B - PROPERTY TO BE SEIZED
Page 1-of-2

### REGARDING THE SEIZURE OF COMPUTER INFORMATION

In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

1. Upon securing the premises, law enforcement personnel trained in searching and seizing computer data who are not directly involved in the investigation of this case (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

2. If the computer personnel determine it is not practical to perform an on-site search of the data within a reasonable amount of time, then the computer equipment and storage devices will be seized and transported to The Regional Computer Forensic Laboratory ("RCFL") for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

3. In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

4. If the computer personnel determine that the data does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time not to exceed 60 days from the date of seizure unless further authorization is obtained from the Court.

5. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

   a. Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

//
//
//

# ADDENDUM TO ATTACHMENT B - PROPERTY TO BE SEIZED
## Page 2-of-2

b. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

e. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.